COLEMAN, JUSTICE, FOR THE COURT:
¶ 1. Fresenius Medical Care Holdings, Inc., and Fresenius USA, Inc., operates dialysis treatment clinics throughout the United States, including Mississippi. Fresenius also manufactures and sells dialysis products, including GranuFlo, a product administered to patients being treated for end-stage renal disease. GranuFlo is an acid concentrate that is mixed with bicarbonate and water to create a dialysis fluid. In 2014, the State of Mississippi brought a civil action against Fresenius, alleging that it had engaged in unfair and deceptive trade practices in connection with GranuFlo in violation of the Mississippi Consumer Protection Act. Today, a batch of discovery disputes arising between the State and Fresenius reach the Court on interlocutory appeal.
¶ 2. On February 22, 2016, the State filed a motion to compel discovery against Fresenius and requested a privilege log. On March 25, 2016, Fresenius provided the State with a privilege log similar to the logs produced in other GranuFlo litigation pending elsewhere. Although the State had objected, Fresenius did not log each individual email and email attachment; rather, Fresenius logged "families" or aggregates of documents, i.e. , Fresenius logged only the last email in an email chain.
¶ 3. On April 22, 2016, the chancery court granted the State's motion to compel and ordered Fresenius to produce a "full and complete privilege log" to the State. On July 1, 2016, Fresenius produced a second amended privilege log to the State. Fresenius continued utilizing the family logging method. On July 29, 2016, the State filed a second motion to compel, seeking (1) all emails and email attachments not separately identified on Fresenius's July 1, 2016, privilege log; (2) withheld *42 documents referred to as attorney notifications[1] (nurses' memoranda sent to doctors and in-house counsel); and (3) withheld documents referred to as public comment advice[2] (public relations documents).
¶ 4. On September 9, 2016, the chancery court ordered Fresenius to produce all emails and email attachments that were responsive to the State's discovery requests, that had not been produced, and that had not been separately identified on Fresenius's July 1, 2016, privilege log. The chancery court also ordered Fresenius to submit attorney notifications and public relations documents for in camera review. Fresenius sought interlocutory review of the portion of the September 9, 2016, order requiring the production of emails and email attachments. Meanwhile, Fresenius submitted the attorney notifications and public relations documents for in camera review. On March 15, 2017, the chancery court ordered that Fresenius produce the attorney notifications and public relations documents. Fresenius also sought interlocutory review of the March 15, 2017, order. The Court granted both interlocutory appeals and consolidated the separate appeals.
¶ 5. Fresenius raises the following issues on interlocutory appeal:
I. Whether the Chancery Court erred in imposing the "death penalty" sanction-finding a blanket waiver and ordering Fresenius to produce privileged documents-based on a determination that Fresenius'[s] extensive, detailed privilege log was somehow inadequate.[3]
II. Whether the Chancery Court erred in ordering Fresenius to produce documents known as Attorney Notifications, which were prepared by Fresenius employees at the direction of in-house counsel for the *43 purpose of facilitating legal analysis of certain adverse events that were deemed likely to lead to litigation, simply because those documents were also copied to Fresenius'[s] Chief Medical Officer, a senior Fresenius executive, for the purpose of reviewing medical and safety issues.
III. Whether the Chancery Court erred in ordering Fresenius to produce documents identified as Public Comment Advice documents, which are communications between Fresenius employees and Fresenius'[s] Chief Litigation Counsel concerning the appropriate public statements for the company to make concerning GranuFlo, a Fresenius product that was the subject of likely litigation.
IV. Whether the Chancery Court violated Rule 53 of the Mississippi Rules of Civil Procedure by adopting the Special Master's Recommendation before the Special Master filed the record with the clerk and before the parties even had a chance to review the Recommendation, let alone file written objections, thereby tainting its further decisions with respect to the same issues.
FACTS AND PROCEDURAL HISTORY
¶ 6. On January 28, 2014, the State filed a civil action against Fresenius, alleging that Fresenius had violated the Mississippi Consumer Protection Act by providing false product information and misrepresenting or concealing the risks associated with its dialysis product GranuFlo. The State alleged that Fresenius knew or should have known that the administration of GranuFlo resulted in dangerously increased bicarbonate levels during dialysis treatment. The State alleged that Fresenius had violated the Act because GranuFlo used in dialysis treatments was defective; Fresenius failed to provide adequate warnings of the risks associated with GranuFlo; treatments using GranuFlo harmed dialysis patients in Mississippi; and the State bore the costs of treatments using GranuFlo that were provided to patients covered by Medicaid and the State Health Plan.
¶ 7. Throughout the proceedings below, the parties frequently referenced pending lawsuits filed by individual personal injury and wrongful death plaintiffs against Fresenius in other jurisdictions relating to GranuFlo and another Fresenius product, NaturaLyte. The pending cases have been consolidated in the United States District Court for the District of Massachusetts, the Superior Court of Massachusetts, and the City Court of St. Louis, Missouri. After the State commenced the present action, Fresenius removed the case to federal court, and ultimately the case was transferred to the multidistrict litigation pending (MDL) in the United States District Court for the District of Massachusetts. The State made a special appearance in the multidistrict litigation solely for the purpose of contesting jurisdiction. On January 2, 2015, the district court granted the State's motion to remand the case to state court. In re Fresenius Granuflo/NaturaLyte Dialysate Prod. Liab. Litig. , 76 F.Supp.3d 268, 278 (D. Mass. 2015).
¶ 8. On July 16, 2015, the State served its initial discovery requests, which included a request for a privilege log. Given what it would contend was similarity to the discovery requests served in the multidistrict litigation, on August 31, 2015, Fresenius notified the State of its intent to produce the same "generic" document production it had produced in the multidistrict litigation *44 consisting of "non-bellwether-patient-specific" documents. On October 16, 2015, the chancery court entered a joint protective order, which provided that the parties "shall comply with the Mississippi Rules of Civil Procedure (unless otherwise ordered by the [chancellor] ) with regard to the production of privilege logs[.]"
¶ 9. On October 22, 2015, Fresenius produced a computer drive containing 22.3 million pages of documents, essentially what it had produced in the pending litigation elsewhere. Fresenius did not provide a privilege log along with the production. Consistent with Fresenius's practice in the other cases, Fresenius withheld attorney notifications and public relations documents. The parties dispute the characterizations and definitions of attorney notifications and public relations documents.
¶ 10. Fresenius defines attorney notifications as "documents created by Fresenius'[s] corporate Clinical Quality Managers at the direction of Fresenius in-house counsel for the purpose of facilitating counsel's rendering legal advice to the company." Clinical Quality Managers are company "nurses or former dialysis nurses that are corporate employees." Fresenius identifies public relations documents as "Public Comment Advice" and defines the documents as "documents containing communications between Fresenius employees and Fresenius'[s] chief litigation counsel concerning the appropriate public statements for the company to make (e.g. , in press releases and customer talking points) after the company determined that GranuFlo was likely to become the subject of litigation."
¶ 11. On November 13, 2015, the State wrote a letter to Fresenius again requesting that Fresenius produce a privilege log. On December 17, 2015, Fresenius informed the State that it "will produce privilege logs produced to Plaintiffs in the MDL and the Mass[achusetts] State Consolidated Proceeding." In response, on December 30, 2015, the State wrote Fresenius, noting that it had yet to receive a privilege log. The State asked when the privilege log would be produced and sought clarification about whether Fresenius claimed privilege for any documents responsive to the State's discovery that had not been included on the privilege logs produced in the other two litigation matters.
¶ 12. On January 13, 2016, Fresenius called the State regarding outstanding discovery issues. Following the call, the State sent an email to Fresenius verifying that it understood that privilege logs from the multidistrict litigation would be produced. The next day, the State sent an email to Fresenius "to point out that the State does not believe the production of 'MDL privilege logs' is appropriate in this case." The State's email continued,
Defendants' privilege log should be responsive to the State's discovery, and should not have extraneous documents on it that are not relevant or responsive to the State's Requests for Production. A privilege log produced in another case in response to other discovery, where different claims are alleged, will presumptively include documents not responsive to the State's discovery. The State objects to being provided a log that is out of date (i.e., that includes documents which have been produced) and that does not include sufficient information to determine whether a privilege is properly invoked. Please confirm that each communication that is alleged to be privileged (i.e., each separate email) will be separately logged on Defendants' privilege log , as opposed to (for example) only logging the parties on the last email in an e-mail chain.
(Emphasis added.)
¶ 13. On February 18, 2016, the parties held a meet and confer conference, but it *45 was unsuccessful in resolving the discovery issues. On February 22, 2016, the State filed a motion to compel, asserting that, it had not received a privilege log from Fresenius. The State complained that Fresenius had failed to specify which of the multidistrict litigation production was actually responsive to the State's discovery requests. The State also complained that Fresenius had failed to timely assert specific privilege objections and identify documents and portions of documents which it claimed were privileged. The State requested that the chancery court find that Fresenius's failure to timely assert its specific privilege objections resulted in waiver. Alternatively, the State requested that the chancery court exercise its power under Mississippi Rule of Civil Procedure 37(a) to sanction Fresenius for its "gross indifference to [its] discovery obligations in failing to disclose what [it has] withheld on privilege grounds, in violation of the [chancery court's o]rder dated October 16, 2015, either by disallowing [Fresenius's] claims of privilege or by ordering [Fresenius] to pay the State's attorney[s'] fees necessitated by this motion and to produce their privilege log within fourteen days."
¶ 14. On March 25, 2016, Fresenius provided the State with a privilege log similar to the logs produced in other GranuFlo litigation. The privilege log contained 22,301 separate entries and identified each withheld document by Bates number, date, document type, sender, recipient(s), subject matter, type of privilege asserted, and the basis for the assertion.
¶ 15. On March 29, 2016, the State filed a reply in support of its motion to compel, arguing that it was improper for Fresenius to respond to the State's discovery requests by producing a 22.3 million page document database and a 22,512 item privilege log of largely irrelevant materials, which had been prepared in response to different discovery requests served under different procedural rules by differently situated plaintiffs who asserted different causes of action. The State also suspected that Fresenius had used the family logging method, i.e. , logging only the parties on the last email in an email chain and not separately logging attachments to emails. On April 15, 2016, Fresenius sent a letter to the State verifying that it had used the family logging method. Specifically, Fresenius had logged email chains by logging the most recent, top message; identifying the date, sender, recipients, and subject matter of the message; describing the entry as an email chain; and describing the basis of the assertion of the privilege or protection.
¶ 16. On April 20, 2016, the chancery court held a hearing on the State's motion to compel. The chancery court expressed its reluctance to find that Fresenius had waived a privilege. The chancery court explained,
[t]o find that a party has, in fact, waived a privilege is, for lack of a better description, the death penalty for that party. It appears on the face of it B and I'm hoping you can show me otherwise, but it appears on the face of it that there has been a failure to comply with discovery at this point, but not to B and particularly with those privileges, but not the extent that I think waivers should be imposed.
¶ 17. At the hearing, the State argued that, if the chancery court did not find waiver, the chancery court should require Fresenius to produce a new privilege log because Fresenius's privilege log did not comply with Mississippi law. The State explained,
So just move to the second issue of why the log does not comply with Mississippi law is that it's not complete, and by that, I mean a couple of things. One is that *46 it's missing the authors of documents in hundreds of instances, it's missing who received document in hundreds of incidences, it's missing the date of the document, and another separate reason is that each communication we believe has not been logged. And this, again, was raised with defense counsel and again in the April 15, 2016, letter that clarified to say, well, we logged document families. It's a direct quote. So I think that means if you had an email chain, right, and let's say there's ten different responses back and forth, each one is a different communication possibly with different people, they didn't log each one. They just put the last -- the most recent one in time.
¶ 18. With respect to email attachments, the State argued,
And I think that also means -- let's say there were ten attachments to the email or there were different attachments at different portions of time. Those attachments aren't logged. So all that appears on the log is word, quote, unquote, attachment. So we can't tell from the log what the attachments are, and it could be, you know, that the attachment is not privileged even if the communication is, and we can't tell for each email communication which ones are and aren't privileged.
¶ 19. The State requested that the new privilege log be limited to documents that were "actually responsive to the State's discovery and have been reviewed by counsel, both for responsiveness and for privilege, every single document." The State further requested "that [Fresenius] remove any entries for documents [it has] produced, that [it] accurately identify each author and each recipient for each communication, not just the last one in the email chain, and for each attachment, and that [it] accurately B accurately describe each attachment[.]"
¶ 20. Fresenius responded,
[Counsel for the State] pointed out that there were a number of documents where we only logged the family of documents, and that is correct, Your Honor. That is how we approached logging. What we did was we would log a document reflecting the "to" and "from" on the top email, and we would reflect if an attachment was included with that document. We did not log each attachment individually.
¶ 21. Counsel for Fresenius continued,
[h]owever frequently ... attachments to the emails existed elsewhere in the production in non-privilege form." Counsel stated that "for instance, if a document was forwarded to counsel for legal advice, that form of the document would not be produced in discovery. However, that same document probably exists in some other data base in a non-privilege form and it would be produced. So it's not that every attached document is actually being withheld as privileged, just that particular communication is.
(Emphasis added.)
¶ 22. On April 22, 2016, the chancery court granted the State's motion to compel and entered an order directing Fresenius to provide a full and complete privilege log. The chancery court found,
That [Fresenius] ha[s] thwarted reasonable discovery in th[e] case by (1) "dumping" massive responses from a similar case (MDL) to which the State was not a party without any reasonable method or manner of identification or reviewing as a response to Plaintiff's discovery, (2) failing to fully respond with complete data as indicated by numerous emails and correspondence lacking sender, recipient, dates, or attachments, *47 (3) failing to provide adequate responses and production of information that are available in their normal course of business while claiming same to be unduly burdensome, (4) failing to show a reasonably diligent search for all responsive materials within their possession, custody and control, (5) failing to timely identify documents that were withheld on privilege grounds, and to state the grounds for their assertions of privilege, and (6) failing to reasonably and timely provide a privilege log for documents withheld under a claim of privilege.
¶ 23. Moreover, the chancery court found,
Defendants' privilege objections to [a number of the State's discovery requests] shall be denied unless within 14 days of the date hereof a full and complete privilege log is provided to the Plaintiff so that it may be reasonably ascertained whether or not such privilege applies. If Plaintiff further objects to the privilege raised and identified, further proceedings for the Court to ascertain same shall be conducted.
¶ 24. The chancery court ordered that Fresenius shall, within fourteen days of the order,
certify they have (1) produced all responsive materials in their possession, custody, or control; (2) have identified which documents have been produced in response to each Request; and (3) will produce any additional responsive documents in Defendants' possession, custody or control and finally (4) that Counsel has examined each document provided and finds it responsive to the discovery request.
¶ 25. On May 6, 2016, Fresenius provided the State with an amended privilege log containing 22,297 separate entries. The amended privilege log included manually added information for hard copy documents, including recipients and subject matter. On June 3, 2016, Fresenius supplemented the amended privilege log.
¶ 26. On June 10, 2016, the State sent Fresenius a letter objecting to the amended privilege log and notified Fresenius of its intent to file a second motion to compel if its issues with regard to the privilege log could not be resolved. On June 28, 2016, Fresenius responded, writing that "[m]any of the entries on the Fresenius MS State Privilege Log are the product of the document review in the Granuflo multi-district litigation and Consolidated Massachusetts State cases." Fresenius wrote that it expected to produce a "full revised log" by the end of the week.
¶ 27. On July 1, 2016, Fresenius produced a second amended privilege log containing 21,593 separate entries, which removed duplicative and nonresponsive entries. The July 1, 2016, privilege log is the subject of the present appeal. On July 29, 2016, the State filed a second motion to compel discovery. The State argued that Fresenius had failed to comply with April 22, 2016, order because it had not provided any descriptive information for unspecified attachments to email communications or anything other than the most recent communication in each withheld email chain. The State requested that the chancery court order production of unspecified attachments to emails and anything other than the most recent communication in each withheld email chain. The State also requested that the chancery court order Fresenius promptly to correct its privilege log by removing thousands of entries for irrelevant and nonprivileged documents.
¶ 28. The State moved the chancery court to compel production of public relations documents and attorney notifications for in camera review and, after review, to *48 order production of nonprivileged materials. The State argued that the public relations documents and attorney notifications were relevant to show what Fresenius knew and when it knew about the dangers associated with GranuFlo. Specifically, the State believed that the withheld documents showed that Fresenius knowingly misrepresented GranuFlo as safe while nurses and doctors were simultaneously documenting and discussing cardiac events and deaths potentially associated with the use of GranuFlo.
¶ 29. On August 19, 2016, Fresenius filed a response to the State's second motion to compel, arguing that the documents were privileged and that similar privilege challenges concerning many of the same documents had been rejected by courts in Massachusetts and Missouri. Fresenius also argued that the "State's requested relief serves no purpose" because "there [was] simply no basis for the State's demand; all responsive, non-privileged attachments and email chains have already been produced." Fresenius argued that "the State has already received all non-privileged documents responsive to a search term across the custodial files for [thirty-four] individuals."
¶ 30. Fresenius argued that the April 22, 2016, order "did not require Fresenius to separately identify all privileged attachments and email chains, which are logged in a manner comparable to the State's privilege log." Fresenius also argued that its methodology of family logging has been recognized by other courts as valid. Finally, Fresenius argued, were it required to identify each individual email within a chain separately, a massive, unwieldy privilege log with largely duplicative entries would result. Fresenius argued, that the burden associated with the task would be oppressive and impose needless delay.
¶ 31. On September 7, 2016, the chancery court held a hearing on the State's second motion to compel. On September 9, 2016, the chancery court entered an order granting the State's motion. The chancery court found that Fresenius had
failed to provide information on their privilege log regarding each email communication that the Defendants claim is privileged, has failed to timely identify documents, including attachments to emails, that were withheld on privilege grounds, and has failed to reasonably and timely provide a full and complete privilege log for documents withheld under a claim of privilege so that the State may reasonably ascertain whether or not the privilege applies.
¶ 32. Accordingly, the chancery court ordered Fresenius to produce "all emails and attachments which are responsive to the State's discovery but which have not been produced and are not separately logged on the Defendants' July 1, 2016 privilege log."
¶ 33. With respect to public relations documents, the chancery court found that Fresenius had "withheld from production eighty-four (84) documents concerning public relations, media management, and customer talking points [public relations documents], which are subjects that call into question whether the communications were made for the purpose of facilitating the rendition of professional legal, as opposed to business, services to the client."
¶ 34. With respect to attorney notifications, the chancery court found that Fresenius had
withheld from production at least two-hundred-and-eighty memoranda authored by nurses and sent to the doctors at the doctors' request regarding serious adverse medical events. Based on the evidence before the [chancery c]ourt, these communications to the doctors do not fall within MRE 502 because the *49 doctors do not meet the definition of lawyer, lawyer's representative, client, or client's representative as defined in MRE 502(a). Further, the [State has] a substantial need for said memoranda and is unable to obtain same by any other means.
¶ 35. The chancery court ordered that Fresenius submit, for in camera review, the public relations documents and all withheld attorney notifications which were sent to doctors or found in doctors' files and which concern or discuss GranuFlo. Finally, the chancery court ordered Fresenius to produce "a revised privilege log that only lists documents which are responsive to the State's discovery in this case, and that fully complies with [the chancery court's o]rder."
¶ 36. Fresenius filed a petition for interlocutory appeal seeking review of the portion of the chancery court's order requiring the production of all emails and attachments which had been responsive to the State's discovery, but which had not been produced and had not been separately logged on the July 1, 2016, privilege log. The Court granted Fresenius's petition. Meanwhile, on September 22, 2016, Fresenius submitted the following withheld documents for in camera review: 101 attorney notifications, which were sent to doctors or found in doctors' files and which concern or discuss GranuFlo or an unknown acid concentrate;[4] and eighty-four public relations documents, which generally included "draft talking points, draft media responses, and draft field education materials."
¶ 37. Fresenius verified that it had "conducted a responsiveness review of the underlying documents for the privilege log entries on its July 1, 2016 Amended Privilege log." Fresenius also verified that it would produce a revised privilege log that lists only documents that are privileged and responsive to the State's discovery. On the same day, Fresenius served a revised privilege log containing 3,292 entries.
¶ 38. On November 28, 2016, the chancery court entered an order sua sponte appointing the Honorable A.E. "Rusty" Harlow as special master in the case to hear the discovery issues related to the attorney notifications and public relations documents."[5] The chancery court directed the special master to hear the matter and recommend a ruling to the chancery court. The special master held an evidentiary hearing on December 8, 2016.
¶ 39. On February 13, 2017, the chancery court held a telephonic status conference with Fresenius and the State during which the State asked the chancery court when it could expect a ruling on the discovery issues heard by the special master. According to Fresenius, the chancery court responded that the special master was "in chambers at that very moment, and the [chancery c]ourt was reviewing the [s]pecial [m]aster's draft [r]ecommendation." Following the conference, the special master's recommendation was entered. The special master recommendation concluded that the attorney notifications and public relations documents were not privileged. The chancery court entered an order accepting the special master's recommendation and directed the State to draft *50 an order consistent with the special master's findings to, forward it to all counsel for an agreement as to form and not content, and to return it to the chancery court within ten days.
¶ 40. On February 16, 2017, the State submitted a proposed order, and Fresenius objected, arguing that the chancery court had violated Mississippi Rule of Civil Procedure 53(g) by accepting the special master's recommendation on the same day that the recommendation was entered, which deprived Fresenius any opportunity to file objections before its acceptance. Fresenius argued that the chancery court "simply rubber-stamped the special master's recommendation and directed the State to prepare an order." Fresenius also maintained that the special master erred in finding that the attorney notifications and the public relations documents were not privileged.
¶ 41. The State withdrew its proposed order and on February 24, 2017, the chancery court held a hearing. The chancery court found that Fresenius had waived its objections to the appointment of a special master; however, the chancery court stated that it should have given Fresenius an opportunity to object to the special master's recommendation. The chancery court found that Fresenius was entitled to have the chancery court hear the matter if it was aggrieved by the special master's recommendation. The chancery court set aside its order accepting the special master's recommendation.
¶ 42. After verifying that the order accepting the special master's recommendation had been set aside, Fresenius continued arguing that, after the special master had prepared a report and recommendation, it was entitled to "de novo review of that report or recommendation" under Rule 53. Fresenius claimed that the chancery court's having entered an order accepting the special master's ruling without Fresenius's "having that procedural right to object to and challenge [the special master's] order, that resulted in prejudice to [Fresenius] in that th[e] matter has already been ruled upon by the [chancery c]ourt[.]" Fresenius claimed that the prejudice stemming from the chancery court's ruling prior to its having an opportunity to respond to the special master's report and recommendation could not be cured unless the chancery court denied the State's motion to compel.
¶ 43. The chancery court responded that it was "giving [Fresenius] an entirely new hearing." Again, the chancery court reminded Fresenius that the order accepting the special master's recommendation had been set aside, and that the chancery court would "hear the matter in its entirety de novo , for lack of a better term." The chancery court stated that it would allow Fresenius to present any additional argument and evidence at the hearing. As such, the chancery court determined that Fresenius was not prejudiced. Following the hearing, the chancery court entered an order setting aside its order accepting the special master's recommendation and ordered the parties to appear on March 3, 2017, for a hearing on State's second motion to compel. On March 3, 2017, the chancery court held the hearing.
¶ 44. On March 15, 2017, the chancery court entered an order granting the State's motion, except for the State's request of fees and sanctions. The chancery court generally categorized the documents submitted in camera as "Attorney Notifications and related communications," "Internal communications with counsel and others regarding draft communications for distribution to the field and/or to third parties," and "Patient Safety Organization *51 documents."[6] The chancery court noted that the documents were withheld by Fresenius based upon the attorney client privilege and the work product doctrine. As to the attorney notifications, the chancery court made the following findings:
The attorney notifications, were prepared by nurses and sent to doctors or found in doctor[s]'s files. These memoranda were prepared both at the direction of counsel, and at the direction of Dr. Lazarus, the Chief Medical Officer. Dr. Lazarus provided the nurses with directions as to what to include in the memoranda for his purposes. Deposition of John Michael Lazarus, M.D., 1/21/2015 at 626:12-627:14 ("And I ask them to be as liberal as they could, think of anything, throw anything in here that you think may have been a potential root cause.... I encouraged them to put everything in." The medical staff received and reviewed the reports for independent medical purposes. E.g., Hearing Transcript of 1/6/2016, testimony of Wendy Millette, Vol 1, pp. 144:12-13, 148:17-149:3, 188:20-23. The medical officers reviewed each and every one of these reports to "make a determination on whether or not improvements need to be made for the sake of patient safety." Hearing Transcript of 10/15/2015, testimony of Melissa Baker, p. 172:3-12. The attorney notifications sent to the attorneys are the same documents that were prepared for and sent to the Chief Medical Officers for medical and safety purposes. These notifications were not sent to the Chief Medical Officers for any legal purposes. The attorney notifications listed on Attachment I were not sent to doctors to facilitate professional legal services to the client; rather, they were sent for medical and safety purposes. The doctors do not meet the definitions set forth in Rule 502(a) of client, representative of the client, lawyer, or representative of lawyer. Although the Defendants made arguments, they failed to offer evidence sufficient to meet their burden of proof on this issue. For these reasons, the attorney notifications sent to the doctors are not privileged communications and must be disclosed by the Defendants to the Plaintiff.
¶ 45. The chancery court continued and addressed Fresenius's work product argument with respect to the attorney notifications:
It is clear to [the chancery c]ourt that the notifications in question were forwarded to the doctors and in some cases, copied to counsel, but were for purposes other than legal advice. Further, these notifications were forwarded to medical personnel in the ordinary course of medical business and do not meet the criteria of work product which would allow them to be withheld from discovery in this matter. As effectively argued by Plaintiffs in their proposed findings, "Because the memoranda on Attachment I were sent by the nurses to the doctors in the ordinary course of medical business, they are not work product. E.g. , Hearing Transcript of 10/15/2015, testimony of Wendy Millette, p. 64:14-65:7 (testifying it was a medical business decision to sent the memoranda to the physicians). Independently, the documents on Attachment I are discoverable based on the State's substantial need and inability to obtain the substantial equivalent of these documents by other means. MRCP 26(b)(3). E.g., Hearing Transcript of 12/8/2016, testimony of Ronald Castle, p. 160:6-17 (witness unable to identify documents *52 providing the root cause analyses via alternate means).
¶ 46. Based on the chancery court's findings, the chancery court ordered Fresenius "to produce all 'Attorney Notifications' [identified in its order] which were sent to doctors or found in doctors' files, which concern or discuss GranuFlo[.]"
¶ 47. As to the public relations documents, the chancery court found,
The [chancery c]ourt finds that the Defendants have failed to meet their burden in claiming that privilege. Though Counsel for the Defendants strenuously argue that the privilege exists, "the services provided by the attorney must be legal services in order to be cloaked with the privilege." Miss. R. Evid. 502 Comment. MRE 502 protects confidential communications "made to facilitate professional legal services " (emphasis added). Counsels' involvement does not convert public or customer relations activities into legal work. See , e.g. , In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liab. Litig. , No. 08-1967-MD-W-ODS, 2011 WL 1136440, at *3-7, 9-11 (W.D. Mo. Mar. 25, 2011). Courts have previously rejected the assertion of attorney client privilege as to an email exchange that included legal counsel and discussed the presentation of information to the press. E.g. , Chesapeake Bay Found., Inc. v. U.S. Army Corps of Engineers , 722 F.Supp.2d 66, 73 (D.D.C. 2010) ("merely stating that a communication contains 'legal advice,' or comes from an attorney, is insufficient to show that the privilege is appropriate.") Accordingly, the public relation materials are found to be discoverable and not subject to any attorney/client privilege.
¶ 48. The chancery court ordered Fresenius "to produce all documents enumerated [in its order] which concern public relations, media management, and customer talking points[.]" Aggrieved, Fresenius filed a petition for interlocutory appeal. The Court granted the petition and consolidated the appeal with Fresenius's previously granted petition stemming from the September 9, 2016, order.
DISCUSSION
I. Whether the chancery court erred by ordering the production of responsive emails and email attachments not separately logged and not previously produced.
¶ 49. Fresenius frames the present assignment of error as "whether the [c]hancery court abused its discretion in imposing the drastic sanction of waiver based on a perceived deficiency in Fresenius's privilege log." Fresenius argues that the chancery court abused its discretion in two distinct ways: (1) it applied the wrong legal standard in evaluating the adequacy of Fresenius's privilege log as to email chains and attachments; and (2) even if it did not apply the wrong legal standard, it committed a clear error of judgment by imposing the sanction of waiver because the record does not support any finding of willful misconduct by Fresenius.
A. Standard of Review
¶ 50. The chancery court is afforded broad discretion in discovery matters, and we will not overturn a chancery court's decision unless there is an abuse of discretion. Newsome v. Shoemake , 234 So.3d 1215, 1226 (¶ 43) (Miss. 2017). "If the [chancery] court applies the correct legal standard, we must affirm the decision, regardless of what any of us individually might have ruled had we been the judge, unless there is a definite and firm conviction that the court below committed clear error." Id. (quotations and citations omitted).
*53 ¶ 51. "In the imposition of sanction, the trial court has considerable discretion in matters pertaining to discovery and its orders will not be disturbed in the absence of abuse of discretion." Kilpatrick v. Miss. Baptist Med. Ctr. , 461 So.2d 765, 767 (Miss. 1984). "Abuse of discretion is the most deferential standard of review appellate courts employ." Ashmore v. Miss. Auth. on Educ. Television , 148 So.3d 977, 982 (¶ 13) (Miss. 2014). In City of Jackson v. Rhaly , 95 So.3d 602, 607 (¶ 10) (Miss. 2012), we wrote,
[t]he decision to impose sanctions for discovery abuse is vested in the trial court's discretion. The provisions for imposing sanctions are designed to give the court great latitude. The power to dismiss is inherent in any court of law or equity, being a means necessary to the orderly expedition of justice and the court's control of its own docket. When this Court reviews a decision that is within the trial court's discretion, it first asks if the court below applied the correct legal standard. If the trial court applied the right standard, then this Court considers whether the decision was one of several reasonable ones which could have been made. This Court will affirm a trial court's decision unless there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of relevant factors."
City of Jackson v. Rhaly , 95 So.3d 602, 607 (¶ 10) (Miss. 2012).
B. Fresenius's Assignment of Error and the Chancery Court's April 22, 2016, Order
¶ 52. Before analyzing Fresenius's arguments on appeal, we first address Fresenius's attempt to challenge the chancery court's April 22, 2016, order.
¶ 53. Although Fresenius appeals from the chancery court's September 9, 2016, sanction, Fresenius attacks the chancery court's April 22, 2016, order in two different ways. First, Fresenius takes the position that the April 22, 2016, order did not specifically require it to log each and every email in a chain separately and each and every email attachment. Fresenius's position that it was not aware that the April 22, 2016, order required it to abandon its family logging method is not credible based on the record and the chancery court's orders read in context of the parties' respective arguments.
¶ 54. On January 14, 2016, the State suspected that Fresenius would use the family logging method before it even had received the Fresenius's first privilege log. The State advised Fresenius that the family logging method would be unacceptable. On February 22, 2016, the State filed its first motion to compel, requesting Fresenius to produce a privilege log. Fresenius did not produce a privilege log until March 25, 2016. The crux of the State's argument in support of its motion to compel was that Fresenius's initial privilege log was insufficient to determine whether a privilege was properly invoked because Fresenius did not log each email and email attachment within an email chain. The State asked the chancery court to declare a waiver of privilege objection based on the untimely and insufficient privilege log. The State also requested that the chancery court order the production of a new privilege log that identified each email and email attachment within an email chain.
¶ 55. On April 22, 2016, the chancery court entered an order granting the State's motion to compel. The chancery court found that Fresenius had "thwarted reasonable discovery" in several ways, including failing to timely and reasonably provide a privilege log for documents withheld *54 under a claim of privilege. Although the chancery court declined to find that Fresenius had waived any privilege objections, the chancery court found that Fresenius's privilege objections would be denied unless "a full and complete privilege log is provided to the [State] so that it may reasonably ascertained whether or not such privilege applies." The chancery court ordered that "[i]f [the State] further objects to the privilege raised and identified, further proceedings for the [chancery c]ourt to ascertain same shall be conducted." Fresenius did not appeal from the April 22, 2016, order nor did it seek clarification of what the chancery court expected when it ordered the production of a full and complete privilege log.
¶ 56. Fresenius revised its privilege log but continued to use the family logging method. The State filed a second motion to compel, arguing that Fresenius had failed to comply with April 22, 2016, order because it had continued to use the family logging method. The State requested that the chancery court order production of unlogged email communications and attachments.
¶ 57. In response, Fresenius argued that the chancery court's order did not require it to separately log each individual email chain. At the hearing, Fresenius argued,
the reason for that is I hope that when you provide a privilege log and you do the top email, that next email if it's -- if it's responsive and not privileged, they're going to get that next email when it's on a shorter chain. And the next email, that should be on a privilege log, also, but we're not doing each one in order like that. That just is incredibly duplicative. That's the problem with it. It's no benefit to them, just incredibly duplicative to us. Doesn't help them, just hurts us.
¶ 58. On September 9, 2016, the chancery court rejected Fresenius's argument and granted the State's second motion to compel. The chancery court found that Fresenius had
failed to provide information on [its] privilege log regarding each email communication that [it] claim[s] is privileged, has failed to timely identify documents, including attachments to emails, that were withheld on privilege grounds, and has failed to reasonably and timely provide a full and complete privilege log for documents withheld under a claim of privilege so that the State may reasonably ascertain whether or not the privilege applies.
¶ 59. The order and record obviously show that the chancery court had required Fresenius to separately log each and every email and attachment within in an email chain. The chancery court found that the privilege log was insufficient and sanctioned Fresenius by ordering the production of "all emails and attachments which are responsive to the State's discovery but which have not been produced and are not separately logged on [Fresenius's] July 1, 2016 privilege log." The chancery court accommodated Fresenius's duplicative argument by ordering that any responsive email communication or attachment that already had been produced or separately logged was not subject to production.
¶ 60. As for the second indirect attack on the chancery court's April 22, 2016, order, Fresenius argues that the order constituted an abuse of discretion because it required Fresenius to log each and every email in a chain and each and every email attachment separately. Again, Fresenius did not appeal from the April 22, 2016, order; however, we will address Fresenius's second argument in the context of whether the chancery court erred in its September 9, 2016, order by finding that *55 the failure to log all emails and email attachments separately within an email chain resulted in a wavier of privilege.
C. Whether the chancery court applied the wrong legal standard.
¶ 61. Fresenius argues that the chancery court applied the wrong legal standard in determining that Fresenius's privilege log was inadequate under Mississippi law. Fresenius argues that the chancery court failed to take into account the nature of email communications as have other courts that have approved the family logging method, because the most recent, top email in a chain reflects a single communication consisting of the sender's message, as well as all prior messages and attachments that make up and are connected to the original email.
¶ 62. Fresenius claims that the Court need only decide a narrow legal issue-namely, whether a party engaged in voluminous electronic discovery is required to log each and every email in a chain and each and every email attachment separately on its privilege log. The Court declines Fresenius's invitation. The present case does not call for the Court to issue a bright line, one-size-fits-all logging method that is appropriate in every case.
¶ 63. The "application of privileges to email communications remains an evolving area of the law." Dawe v. Corrs. USA , 263 F.R.D. 613, 621 (E.D. Cal. Oct. 2009). Indeed, "[c]ourts are divided about even the basic question of whether it is sufficient to list an e-mail chain as a single entry or whether each individual e-mail within the chain must be identified." Acosta v. Target Corp. , 281 F.R.D. 314, 320 (N.D. Ill. 2012) ; see also Helm v. Alderwoods Grp., Inc. , 2010 WL 2951871, at *2 (N.D. Cal. July 27, 2010).
¶ 64. Fresenius cites several district court cases for the proposition that where a party logs the most recent message in an email chain, it need not log every preceding message in the same chain separately. See e.g. , United States v. ChevronTexaco Corp. , 241 F.Supp.2d 1065, 1075, n.6 (N.D. Cal. 2002) ; Muro v. Target Corp. , 250 F.R.D. 350, 363 (N.D. Ill. 2007). Fresenius argues that if an email communication is privileged, then the entire communication is privileged, including any attachment to the email chain. However, Fresenius acknowledges that other courts have required parties to provide separate entries on their privilege logs for every message in an email chain. See e.g., In re Universal Serv. Fund Tel. Billing Practices Litig. , 232 F.R.D. 669 (D. Kan. 2005). Similarly, as for attachments, district courts have determined that, even if the trial court has found parent emails to be privileged, "federal courts generally 'expect that attachments, like earlier strings in e-mail correspondence, need to be treated separately and logged as such.' " In re Application of Chevron Corp. , 2013 WL 11241413, at *5 (D.D.C. Apr. 22, 2013) (quoting Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc. , 2011 WL 3738979, at *4 (S.D.N.Y. Aug. 18, 2011), report and recommendation adopted , 2011 WL 3734236 (S.D.N.Y. Aug. 24, 2011) ).
¶ 65. The United States Court of Appeals for the Fifth Circuit recently addressed privilege logs:
Given the "broad" and "considerable discretion" district courts have in discovery matters, we will not analyze the privilege logs in the first instance. See Winfun v. Daimler Chrysler Corp. , 255 Fed. App'x. 772, 774 (5th Cir. 2007) (quoting Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc. , 73 F.3d 546, 569 (5th Cir. 1996) ). Nevertheless, the error below counsels us to reiterate that although Rule 26"does not attempt to define for each case what information *56 must be provided," 1993 Advisory Comm. Notes to Fed. R. Civ. P. 26 ¶ 33, a privilege log's description of each document and its contents must provide sufficient information to permit courts and other parties to "test[ ] the merits of" the privilege claim. United States v. El Paso Co. , 682 F.2d 530, 541 (5th Cir. 1982) ; Interbake Foods, LLC , 637 F.3d at 502 ("When a party relies on a privilege log to assert these privileges, the log must 'as to each document ... set[ ] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed.' ") (quoting Bowne, Inc. v. AmBase Corp. , 150 F.R.D. 465, 474 (S.D.N.Y. 1993) ). Continual failure to adhere to Rule 26's prescription may result in waiver of the privilege where a court finds that the failure results from unjustified delay, inexcusable conduct, or bad faith. See United States v. Philip Morris Inc. , 347 F.3d 951, 954 (D.C. Cir. 2003).
Equal Emp't Opportunity Comm'n v. BDO USA, L.L.P. , 876 F.3d 690, 696-97 (5th Cir. 2017).
¶ 66. The Court has not addressed precisely how email chains and attachments should be treated in preparing privilege logs, but the Court has held that "a party asserting privilege as a basis to withhold requested documents from production has a responsibility to review the requested documents and specifically identify those documents and portions of documents for which it, in good faith, claims are privileged." Powell v. McLain , 105 So.3d 308, 314 (¶ 18) (Miss. 2012) (emphasis added). "Defendants have an obligation to identify specifically every relevant document withheld on the basis of privilege so the [trial] court is able to make an informed decision on a motion to compel." Id. at 315 (¶ 20).
¶ 67. The Court also has written that counsel has the professional responsibility to "carefully review the requested documents and specifically identify those documents and portions of documents for which it, in good faith, claims are privileged." Roman Catholic Diocese of Jackson v. Morrison , 905 So.2d 1213, 1248 (¶ 128) (Miss. 2005) (emphasis added). In Morrison , the Roman Catholic Diocese of Jackson had failed to assert privilege precisely as to particular documents. Id. As a result, the Court directed the Diocese as follows:
For documents and responses it claims are privileged, we direct the Diocese to provide to the trial court a detailed privilege log in which each such response and document, and portion of a response or document , claimed to be privileged is listed and identified by file name, document number, and privilege claimed.
Morrison , 905 So.2d at 1248 (¶ 129) (emphasis added).
¶ 68. Like the counterpart Federal Rules of Civil Procedure, the Mississippi Rules of Civil Procedure do not attempt to define for every case what information must be provided with respect to privilege logs for email communications and attachments. The Court agrees with Fresenius that what is necessary in one case might not be necessary, practical, or economical in another case.
¶ 69. We have recognized that "[t]he purpose of the Mississippi Rules of Civil Procedure is "to promote justice, uniformity, and the efficiency of the courts[.]" Illinois Cent. R. Co. v. Moore , 994 So.2d 723, 729 n.16 (Miss. 2008). We have stated that "pre-trial discovery is governed by flexible rules well within the administrative capacity of our trial courts." Powell , 105 So.3d at 315 (¶ 21). Fresenius argues that the family logging method is consistent with *57 Rule 1 of the Mississippi Rules of Civil Procedure, and the chancery court's inflexible ruling undermines the rule by requiring a party to incur significant burdens and by adding duplicative entries to its privilege log. Fresenius's argument is without merit. The State and ultimately the chancery court were concerned only with emails and attachments that had been (1) responsive to the State's discovery, (2) had not been produced, and (3) had not been separately logged on the July 1, 2016, privilege log.
¶ 70. "Our trial judges are afforded considerable discretion in managing the pre-trial discovery process in their courts[.]" City of Jackson v. Presley , 942 So.2d 777, 781 (¶ 7) (Miss. 2006). Furthermore, "[o]ur trial judges also have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril." Id. "Parties must take seriously their duty to comply with court orders." Bowie v. Montfort Jones Mem'l Hosp. , 861 So.2d 1037, 1043 (¶ 16) (Miss. 2003).
¶ 71. Fresenius, knowing that courts were divided on the issue of family logging, tested the chancery court's April 22, 2016, order and continued to use the family logging method at its own peril. The chancery court was unpersuaded by Fresenius's argument that the chancery court's previous order did not require it to log responsive emails and attachments separately. The chancery court found that Fresenius's July 1, 2016, privilege log was incomplete because (1) it did not contain separate entries for each and every email within an email chain shown on the log, and (2) it lacked separate entries for attachments to emails shown on the log.
¶ 72. The chancery court properly exercised its discretion by determining that based on the circumstances of the case, every email communication and attachment should have been logged so that the State reasonably could ascertain whether a privilege existed. Because the Mississippi Rules of Civil Procedure do not specifically address the proper methodology of logging email chains and attachments, and because the Court has not weighed in on the matter, we cannot say the chancery court abused its discretion by ordering Fresenius to produce "all emails and attachments which are responsive to the State's discovery but which have not been produced and are not separately logged on the Defendants' July 1, 2016 privilege log."
D. Whether the chancery court abused its discretion by imposing the sanction of waiver.
¶ 73. Alternatively, Fresenius argues that, even if the chancery court did not apply the wrong legal standard, the waiver sanction was not warranted based on the circumstances of the case.
1. "Blanket" Order
¶ 74. Fresenius argues that the chancery court's "blanket order" requiring Fresenius to produce "numerous privileged emails and email attachments that the [chancery] court never even reviewed" constitutes an abuse of discretion. Fresenius claims the chancery court's "sanction-finding a blanket waiver of privilege, without reviewing the subject emails and attachments-is contrary" to the Court's decisions in Powell and Mississippi United Methodist Conference v. Brown , 911 So.2d 478, 481-82 (¶¶ 6-7) (Miss. 2005).
¶ 75. Fresenius misapplies Powell and Brown . The pertinent question is whether the chancery court abused its discretion in applying the sanction of waiver . Fresenius acknowledges on appeal that the chancery court's ruling was not based on facts relevant to specific documents or the privilege itself, but that the ruling operated as a *58 sanction . The issues in Powell and Brown were whether the chancery court abused its discretion by finding that certain documents were not privileged; here, the issue is whether the chancery court abused its discretion by imposing a waiver sanction based on a discovery violation. To be sure, in Brown , the Court held that the trial court's "wholesale ruling that the documents were not privileged was an abuse of discretion." Brown , 911 So.2d at 481 (¶ 6). In Brown , we held,
When objections to discovery of specific documents are made, the trial court should deal with each on an item-by-item basis, carefully considering whether to allow discovery, and stating the rule or exception which provides the basis for the decision." Hewes v. Langston , 853 So.2d 1237, 1250 (Miss. 2003) ; see also Haynes v. Anderson , 597 So.2d 615, 620 (Miss. 1992). The circuit court's order simply stated that all of the documents were subject to discovery because they were kept in the regular course of business, they were not confessional or exclusively religious in nature, or there was a lack of expectation of privacy evidenced by distribution to people other than defendants. Blanket statements as to whether documents may or may not be compelled in discovery procedures simply are not sufficient to meet the standard in Hewes , 853 So.2d at 1250.
Brown , 911 So.2d 478, 481 (¶ 6).
¶ 76. Likewise in Powell , the Court held that "blanket" orders compelling production of documents are not sufficient. Powell , 105 So.3d at 315 (¶ 20) (citing Brown , 911 So.2d at 481 (¶ 6) ). The Powell Court described the insufficient "blanket" order compelling production: "the order compelling production does not contain findings as to each document requested and does not sufficiently state the basis for the circuit court's order to compel." Id. at 315 (¶ 21). Again, the issue in Powell was whether the circuit court had abused its discretion by granting a motion to compel without conducting an item-by-item analysis of each objection; here, the issue is whether the chancery court abused its discretion by ordering production as a sanction . See id. at 315 (¶¶ 21-22).
¶ 77. In short, the order at issue is not the type of "blanket" order described in Powell and Brown . Rather, a mere blanket assertion of a privilege on a privilege log and the failure to identify each and every email communication and attachment in an email chain led the chancery court ultimately to find a waiver of any privilege. A Mississippi district court has found that "[b]lanket assertions of a privilege are unacceptable, and the court and other parties must be able to test the merits of a privilege claim." United Inv'rs Life Ins. Co. v. Nationwide Life Ins. Co. , 233 F.R.D. 483, 486 (N.D. Miss. 2006). Due to the family logging method employed by Fresenius, the chancery court found that the State reasonably could not ascertain whether or not a privilege applied.
¶ 78. Particularly relevant here is the Powell Court's warning that "[d]efendants have an obligation to identify specifically every relevant document withheld on the basis of privilege so the [trial] court is able to make an informed decision on a motion to compel." Powell , 105 So.3d at 315 (¶ 20). The chancery court found that Fresenius had failed to fulfill its obligation to produce a full and complete privilege log. Because the chancery court found that Fresenius had failed to perform its obligation, the chancery court's obligation to conduct an item by item in camera review had not been not triggered.
2. Abuse of Discovery and Sanctions
¶ 79. Fresenius argues that neither the Mississippi Rules of Civil Procedure, nor the Court's decisions, nor the chancery *59 court's April 22, 2016, order "expressly required Fresenius to identify each and every email within a chain separate from the chain itself or to identify each attachment separate from the relevant email. Fresenius argues that the chancery court abused its discretion by imposing the sanction of waiver, because there was no record of bad faith or willful misconduct, but only a perceived deficiency in the July 1, 2016, privilege log.
¶ 80. For the reasons stated above, we reject Fresenius's argument that it was not until the September 9, 2016, order that the chancery court directed Fresenius to log each and every email within a chain and each and every attachment separately. Nonetheless, Fresenius argues that the relevant rule, and thus the alleged violation, must be clear and unambiguous before a court could find bad faith or willful misconduct. In support, Fresenius relies on McKnight v. Jenkins , 155 So.3d 730, 732 (Miss. 2013), and Evans v. Evans , 75 So.3d 1083, 1087 (Miss. Ct. App. 2011). Neither case involved a sanction resulting from a discovery violation. Nonetheless, Fresenius's purported ignorance of a discovery obligation is not supported by the record.
¶ 81. "Under Mississippi Rule of Civil Procedure 37 and the inherent power of the trial court to protect the integrity of its process, the trial court has the broad authority to impose sanctions for abuse-of-discovery violations." E.I. DuPont de Nemours & Co. v. Strong , 968 So.2d 410, 414 (¶ 12) (Miss. 2007). Regarding the failure to comply with an order, Rule 37(b)(2) provides,
(2) Sanctions by Court in Which Action Is Pending. If a party or an officer, director, or managing agent of a party or a person designated under Rules 30(b)(6) or 31(a) to testify in behalf of a party fails to obey an order to provide or permit discovery, including an order made under subsection (a) of this rule, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
(A) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;
(B) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;
(C) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party;
(D) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders.
M.R.C.P. 37(b)(2).
¶ 82. Subsection (e) provides for additional sanctions:
In addition to the application of those sanctions, specified in Rule 26(d) and other provisions of this rule, the court may impose upon any party or counsel such sanctions as may be just, including the payment of reasonable expenses and attorneys' fees, if any party or counsel (i) fails without good cause to cooperate in the framing of an appropriate discovery plan by agreement under Rule 26(c), or (ii) otherwise abuses the discovery *60 process in seeking, making or resisting discovery.
M.R.C.P. 37(e).
¶ 83. In Strong , the Court wrote,
Our trial judges are charged with this responsibility and are in a much better position to resolve all pre-trial issues, including discovery, and it is not, and should not, be part of our mandated appellate review, to resolve such issues.... Our trial judges are likewise in a much better position to decide which parties and/or lawyers need to be sanctioned for their behavior, and our trial judges should unhesitatingly exercise this inherent power and authority.
Strong , 968 So.2d at 414 (¶ 13) (quoting Miss. Farm Bureau Mut. Ins. Co. v. Parker , 921 So.2d 260, 265 (¶ 17) (Miss. 2005) ). The Court "remains steadfastly cognizant that our trial courts must have the authority to issue appropriate sanctions to what the discovery transgression warrants." Eaton Corp. v. Frisby , 133 So.3d 735, 750 (¶ 56) (Miss. 2013).
¶ 84. "In the imposition of sanction, the trial court has considerable discretion in matters pertaining to discovery and its orders will not be disturbed in the absence of abuse of discretion." Kilpatrick , 461 So.2d at 767. The Court has written that the trial court has considerable discretion in ruling on discovery matters, however:
[J]udicial discretion is not boundless but "is defined as a 'sound judgment which is not exercised arbitrarily, but with regard to what is right and equitable in circumstances and law, and which is directed by the reasoning conscience of the trial judge to just result. An abuse of discretion means clearly against logic and effect of such facts as are presented in support of the application or against the reasonable and probable deductions to be drawn from the facts disclosed upon the hearing.
Douglas v. Burley , 134 So.3d 692, 697 (¶ 13) (Miss. 2012).
¶ 85. The Court has "long held that our trial courts have the discretion to impose sanctions for discovery violations which result from willful neglect, willful disobedience or cause undue advantage and surprise." Frisby , 133 So.3d at 748 (¶ 49). "If there is no intent or willful neglect by the violating party, the [trial] court is not justified in imposing sanctions." Hayes v. Entergy Miss. Inc. , 871 So.2d 743, 747 (¶ 11) (Miss. 2004). No distinction exists whatsoever between a trial court's finding of gross indifference or willful negligence to a discovery requirement because both are willful violations and an abuse of the truth seeking process. Frisby , 133 So.3d at 748 (¶ 49). We have explained that "[a] willful violation of a discovery rule occurs when there is a conscious or intentional failure to comply with the rule's requirements." Id. "A finding of willfulness may be based upon either a willful, intentional, and bad faith attempt to conceal evidence or a gross indifference to discovery obligations." Id.
¶ 86. Here, Fresenius was obligated by the chancery court's April 22, 2016, order to produce a full and complete privilege log. Under Rule 37, the chancery court acted within its authority by imposing the sanction of waiver, at minimum, based on Fresenius's gross indifference to its discovery obligation.
3. Good Faith and Reasonableness
¶ 87. Fresenius argues that the record actually establishes "good faith" and "reasonableness" in producing documents and preparing its privilege log. Like the chancery court, we are unpersuaded by Fresenius's good faith and reasonableness arguments. Indeed, the chancery court's April 22, 2016, order found that Fresenius had *61 "thwarted reasonable discovery" in several ways:
(1) "dumping" massive responses from a similar case (MDL) to which the State was not a party without any reasonable method or manner of identification or reviewing as a response to Plaintiffs discovery, (2) failing to fully respond with complete data as indicated by numerous emails and correspondence lacking sender, recipient, dates, or attachments, (3) failing to provide adequate responses and production of information that are available in their normal course of business while claiming same to be unduly burdensome, (4) failing to show a reasonably diligent search for all responsive materials within their possession, custody and control, (5) failing to timely identify documents that were withheld on privilege grounds, and to state the grounds for their assertions of privilege, and (6) failing to reasonably and timely provide a privilege log for documents withheld under a claim of privilege.
¶ 88. Fresenius did not appeal from the chancery court's April 22, 2016, order. The September 9, 2016, order also provided that Fresenius had failed to provide information on its privilege log regarding each email communication that it claimed was privileged; failed to timely identify documents, including attachments to emails; and failed to reasonably and timely provide a full and complete privilege log.
¶ 89. Fresenius's good faith and reasonableness assertions also are undercut by the varying number of entries on the different privilege logs it produced throughout discovery. Moreover, Fresenius's position on how many documents, if any, actually are subject to the chancery court's September 9, 2016, order has wavered throughout the subject litigation and on appeal. "Discovery is not to be treated as a game of hide and seek. It should be a forthright effort to expedite litigation." Rhaly , 95 So.3d at 607-08 (¶ 11).
4. Other Courts
¶ 90. Fresenius argues that the sanction of waiver is contrary to the practice of a host of other courts dealing with alleged deficiencies in privilege logs. For instance, Fresenius cites Muro , in which the trial court found: "In any event, blanket waiver is not a favored remedy for technical inadequacies in a privilege log." Muro , 250 F.R.D. at 360 (citing Am. Nat'l Bank & Trust Co. of Chicago v. Equitable Life Assurance Soc'y of U.S. , 406 F.3d 867, 879 (7th Cir. 2005) (holding that magistrate judge abused his discretion by finding that defects in privilege log merited a sanction of blanket waiver, absent a finding of bad faith) ).
¶ 91. The State points out that other federal district courts have found that the inadequacy of a privilege log may be remedied by deeming the inadequate log a wavier of the privilege. RPM Pizza, LLC v. Argonaut Great Cent. Ins. Co. , 2014 WL 12660120, at *4 (M.D. La. Jan. 14, 2014) (citing N.L.R.B. v. Jackson Hosp. Corp. , 257 F.R.D. 302, 307 (D.D.C. 2009) ); see also Trudeau v. New York State Consumer Prot. Bd. , 237 F.R.D. 325, 335 (N.D.N.Y. 2006) ; Sajda v. Brewton , 265 F.R.D. 334, 338 (N.D. Ind. 2009) ("Improper claims of privilege in response to discovery requests accompanied by evidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules support a finding of waiver.").
¶ 92. Here, the chancery court had authority under Rule 37 to impose the sanction of waiver, and the circumstances support a finding of waiver. "If the trial court applies the correct legal standard, we must affirm the decision, regardless of what any of us individually might have ruled had we been the judge, unless there is a definite *62 and firm conviction that the court below committed clear error." Ferguson v. Univ. of Miss. Med. Ctr. , 179 So.3d 1060, 1064 (¶ 17) (Miss. 2015). While finding a waiver of privilege for certain emails and email attachments is a severe sanction, the decision to impose the sanction was within the chancery court's discretion based on Fresenius's gross indifference to discovery violations.
II. Whether the chancery court erred by ordering Fresenius to produce so-called attorney notifications
¶ 93. The attorney notifications are prepared by clinical quality nurses and sent both to in-house counsel and to company doctors. The attorney notifications are reserved for a subset of the most serious adverse events occurring at the Fresenius clinics. The notification includes a summary of the facts of the event, an analysis of the potential root causes of the event, and any statements of any actions that had been taken since the event occurred. The facts surrounding the attorney notification process are disputed, namely: who implemented the attorney notification process, why the attorney notification process was implemented, who requested attorney notifications, who received attorney notifications, and the purpose of attorney notifications.
¶ 94. Fresenius argues the attorney notifications are communications by Fresenius's clinical quality managers to Fresenius's in-house counsel, prepared at the direction of in-house counsel for the purpose of informing in-house counsel about serious adverse clinic events that the company deemed likely to lead to legal claims against the company. In contrast, the State argues the attorney notifications are "nurse-to-doctor root cause analysis memoranda," which discuss medical and safety issues, and were prepared at the request of company doctors, to serve no legal purpose.
¶ 95. The State argues that Fresenius set up a "funneling ruse" in which it had sent course of business documents to in-house counsel so that it could claim the documents were privileged. Every one of the attorney notifications at issue either was sent to a company doctor or was found in a company doctor's file.
A. Standard of Review
¶ 96. "The application of privilege is properly a mixed question of law and fact, with the [trial] court's factual findings reviewed for clear error and its interpretation of the law reviewed de novo ." Hewes v. Langston , 853 So.2d 1237, 1241 (¶ 13) (Miss. 2003).
B. Attorney Client Privilege
¶ 97. "The burden of proof rests with the party asserting the attorney-client privilege." Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay , 42 So.3d 474, 494 (¶ 61) (Miss. 2010). Mississippi Rule of Evidence 502(b) provides the general rule of attorney client privilege:
(b) General Rule of Privilege. A client has a privilege to refuse to disclose--and to prevent others from disclosing--any confidential communication made to facilitate professional legal services to the client:
(1) between the client or the client's representative and the client's lawyer or the lawyer's representative;
(2) between the client's lawyer and the lawyer's representative;
(3) by the client, the client's representative, the client's lawyer, or the lawyer's representative to another lawyer or that lawyer's representative, if:
*63 (A) the other lawyer represents another party in a pending case; and
(B) the communication concerns a matter of common interest;
(4) between the client's representatives or between the client and a client representative; or
(5) among lawyers and their representatives representing the same client.
M.R.E. 502(b).
¶ 98. Rule 502 also provides several definitions of terms contained within the rule:
(1) "Client" means a person, public officer, corporation, association, or any other public or private organization or entity:
(A) to whom a lawyer renders professional legal services; or
(B) who consults a lawyer with a view to obtaining professional legal services from the lawyer.
(2) "Client's representative" means:
(A) one authorized to:
(i) obtain professional legal services on behalf of the client; or
(ii) act on behalf of the client on the legal advice rendered; or
(B) an employee of the client with information the lawyer needs to render legal services to the client.
(3) "Lawyer" means a person authorized--or who the client reasonably believes is authorized--to practice law in any state or nation.
(4) "Lawyer's representative" means one employed by the lawyer to assist the lawyer in rendering professional legal services.
(5) A communication is "confidential" if not intended to be disclosed to third persons other than those:
(A) to whom disclosure is made to further rendition of professional legal services to the client; or
(B) reasonably necessary to transmit the communication.
M.R.E. 502(a).
¶ 99. The Court interprets the scope of the attorney client privilege under Mississippi law broadly. Nester v. Jernigan , 908 So.2d 145, 148 (¶ 11) (Miss. 2005). "[T]he privilege relates to and covers all information the client received by the attorney in his professional capacity and in the course of his representation of the client." Id. The information includes communications made by the client to the attorney and by the attorney to the client. Id. (citing Barnes v. State , 460 So.2d 126, 131 (Miss. 1984) ). As such, the privilege is a "two-way street." Id. In another sense, it is a "one-way street, for it belongs to the client only." Barnes , 460 So.2d at 131. "[T]he privilege does not require the communication to contain purely legal analysis or advice to be privileged." Nester , 908 So.2d at 148 (¶ 11) (quoting Dunn v. State Farm Fire & Cas. Co. , 927 F.2d 869, 875 (5th Cir. 1991) ). "Instead, if a communication between a lawyer and client would facilitate the rendition of legal services or advice, the communication is privileged." Id.
¶ 100. The chancery court first made a factual finding regarding the attorney notifications in its September 9, 2016, order. It found that Fresenius had "withheld from production ... memoranda authored by nurses and sent to the doctors at the doctors' requests regarding serious adverse medical events." The chancery court found "[b]ased on the evidence before [it], these communications (attorney notifications) to the doctors do not fall within MRE 502 because the doctors do not meet the definition of lawyer, lawyer's representative, client, or client's representative as defined *64 in MRE 502(a)." Finally, the chancery court found that the State had "a substantial need for said memoranda and [was] unable to obtain the same by any other means." The chancery court proceeded to order Fresenius to submit for in camera review all withheld attorney notifications, which were sent to doctors or found in doctors' files and concern or discuss GranuFlo.
¶ 101. On March 25, 2017, following in camera review of the attorney notifications and an evidentiary hearing, the chancery court found that they were not privileged communications and ordered them to be disclosed to the State. The chancery court determined that the "memoranda [attorney notifications] were prepared both at the direction of counsel, and at the direction of Dr. Lazarus, the Chief Medical Officer." The chancery court found that "Dr. Lazarus provided nurses with directions as to what to include in the memoranda for his purposes." The chancery court quoted Dr. Lazarus's testimony, which provided: "And I ask them to be as liberal as they could, think of anything, throw anything in here that you think may have been a potential root cause.... I encouraged them to put everything in."
¶ 102. Based on Fresenius Associate General Counsel Wendy Millette's testimony, the chancery court found that "the medical staff received and reviewed the reports for independent medical purposes." Moreover, relying on the testimony of Clinical Quality Manager Melissa Baker, the chancery court found that "[t]he medical officers reviewed each and every one of these reports to make a determination on whether or not improvements need to be made for the sake of patient safety." The chancery court verified that the "attorney notifications sent to the attorneys are the same documents that were prepared for and sent to the Chief Medical Officers for medical and safety purposes." Also, the chancery court found that the attorney "notifications were not sent to the Chief Medical Officers for any legal purposes." The chancery court determined that it "was clear" that the attorney notifications "were forwarded to the doctors and in some cases, copied to counsel, but were for purposes other than legal advice."
¶ 103. The chancery court concluded that the attorney client privilege did not apply for two reasons. First, the chancery court found that the "attorney notifications ... were not sent to doctors to facilitate professional legal services; rather, they were sent for medical and safety purposes." Second, as the chancery court previously had found in its September 9, 2016, order, the "doctors do not meet the definitions set forth in Rule 502(a) of client, representative of the client, lawyer, or representative of lawyer." The chancery court found that Fresenius had "failed to offer evidence sufficient to meet their burden of proof on [the] issue."
1. Whether the chancery court erred by finding that the notifications were not privileged because they were sent to the company doctors for medical and safety purposes and were not used for any legal purpose.
¶ 104. Fresenius argues that clinical quality managers provided information to the in-house lawyers to enable them to give sound and informed advice. Fresenius claims the attorney notifications are precisely the kind of communications that the attorney client privilege protects from disclosure under Upjohn Co. v. United States , 449 U.S. 383, 390, 394, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (holding "[t]he communications at issue were made by Upjohn employees to counsel for Upjohn acting as such, at the direction of corporate superiors in order to secure legal advice from counsel.") ). Fresenius argues that, because *65 the attorney notifications facilitated the rendition of legal services or advice by in-house counsel, they are privileged under Mississippi law.
¶ 105. Fresenius faults the chancery court for failing to mention that the purpose of the attorney notifications was to inform in-house counsel about events that were likely to lead to legal claims. Fresenius also faults the chancery court for citing "snippets" of Dr. Lazarus's testimony to suggest that the purpose of the attorney notifications was to provide medical information for adverse events, not to provide information to in-house counsel.
¶ 106. The Court disagrees with Fresenius's characterization of the factual findings. Contrary to Fresenius's assertion, the chancery court acknowledged that the attorney notifications were prepared "both at the direction of counsel, and at the direction of ... the Chief Medical Officer." (Emphasis added.) However, the chancery court highlighted the critical difference between the separate requests.
¶ 107. The chancery court found that the purpose of the attorney notifications at issue, which consisted only of notifications sent to doctors found in doctors' files, was to provide medical information for adverse events. Fresenius's in-house counsel likewise illustrated the critical distinction. Millette confirmed that attorney notifications are "a subset of some serious adverse events[,which] are sent to the lawyers to put them on notice, on parallel track with other notifications that go to business and medical offices and medical services." (Emphasis added.) Furthermore, "attorney notifications were a small subset [of adverse events] that the attorneys requested and sometimes it was more efficient for the [clinical quality manager] to copy the Chief Medical Officer on th[e] memos rather than send them separately ." Castle confirmed that attorney notifications were sent to doctors was for the sake of efficiency. Again, the attorney notifications at issue here consist only of the occasions when the notification also was sent to the company doctors.
¶ 108. Fresenius argues that Dr. Lazarus's testimony, relied on by the chancery court, "addressed ordinary adverse-event reports (which Fresenius already had produced to the State),[7] not Attorney Notifications." Fresenius claims that Dr. Lazarus was responding to a line of questioning about a document called "Clinical Variance Analysis for Cardiac & Pulmonary Arrest," which is a "data collection form" specifically for events involving cardiopulmonary arrests created by clinical quality managers after reviewing the medical record, treatment sheet, and clinical variance report. Fresenius claims a "clinical variance report" is another name for an adverse event report.
¶ 109. The State disputes Fresenius's claim regarding Dr. Lazarus's testimony for several reasons: (1) Dr. Lazarus distinguished the nurses's root cause analysis memoranda from the ordinary adverse event reports by explaining that he could not look at all of the ordinary adverse event reports; (2) Dr. Lazarus requested a "potential root cause" analysis, which is not required by the ordinary adverse event policy; (3) Dr. Lazarus was describing memoranda sent to him by the clinical quality managers, not the local clinic reports, which were the adverse event reports; (4) Fresenius has not produced or identified any adverse event report that addresses the same incidents discussed in *66 the attorney notifications; (5) the written adverse event policy allows only for actual facts and forbids any opinion or attempt to draw conclusions; and (6) at the trial level, Fresenius had argued that Dr. Lazarus was discussing a data collection form that possibly was never implemented, but Dr. Lazarus testified that he had reviewed every one of the nurses' memoranda on paper. We cannot say the chancery court abused its discretion in making a factual determination in light of a factual dispute between the State and Fresenius. The chancery court's factual determination that Dr. Lazarus was referring to attorney notifications was supported by the record.
¶ 110. Fresenius also argues, "[t]o the extent that the Chancery Court found that the purpose of the [a]ttorney [n]otifications was not to provide information about serious adverse events to in-house counsel, that finding was clearly erroneous in light of the unrefuted evidence[.]" The chancery court did not make such a factual finding. Again, the chancery court's focus was on the attorney notifications also sent to doctors at their request for medical and safety purposes, not the attorney notifications sent solely to in-house counsel. In other words, the chancery court was not concerned with the same attorney notifications sent to in-house counsel on a parallel track for another purpose.
2. Whether the fact that the attorney notifications were copied to the Chief Medical Officer "destroyed" the attorney client privilege.
¶ 111. Fresenius argues that the "mere fact that [a]ttorney notifications were copied to the Chief Medical Officer does not destroy the privilege." In support, Fresenius argues that the chancery court "suggested that the mere fact that the Attorney Notifications were copied to the Chief Medical Officer-a senior Fresenius executive-for consideration of medical and patient-safety issues somehow destroyed the privilege." Fresenius argues the finding is wrong as a matter of law; however, Fresenius's argument is without merit.
¶ 112. The chancery court did not find that the privilege was "destroyed" or "waived." Fresenius inaccurately claims that [the attorney notifications] were copied only to doctors, and belabors the straw man issue of whether "mere copying destroyed the privilege." The chancery court did not find that the attorney notifications at issue were privileged, and that the privilege had been destroyed or waived because the notifications also were sent to company doctors. Rather, the chancery court focused on the parallel track of notifications that were prepared at the direction of the chief medical officer, who received and reviewed the notifications for independent medical and safety purposes to make a determination about whether improvements needed to be made for the sake of patient safety.
3. Whether the chancery court erred by finding that the company doctors were neither clients nor representatives of the client as defined by Rule 502(a).
¶ 113. Fresenius argues that, "[b]y its plain terms, Rule 502 covers communications between a corporate client and its lawyer; between the client's representative and its lawyer; between the client and its lawyers' representative; between the client's representative and the lawyer's representative; and between two or more of the client's representatives-'to facilitate professional legal services to the client.' " Fresenius argues that, contrary to the chancery court's finding, the chief medical officer was a "representative of the client" under Rule 502(a). Fresenius argues that the chief medical officer, who is a senior executive, is both (1) an employee of the client with information the lawyer *67 needs to render legal services to the client, and (2) a person who is authorized to act on behalf of the client on the legal advice rendered.
¶ 114. The chancery court found that the attorney notifications were not sent to the chief medical officers by the clinical quality managers for any legal purpose. Indeed, Millette testified,
Q. Do you know why Dr. Hakim was copied?
A. He was often copied. He was our chief medical officer.
Q. He was often copied on the attorney notifications?
A. Yes.
Q. And was Dr. Hakim copied on attorney notifications for a legal purpose?
A. He's not a lawyer. He's the chief medical officer, so.
Q. So he was copied for a medical purpose?
A. Yes.
¶ 115. Moreover, Castle was asked whether legal questions were posed to counsel in the attorney notifications at issue, to which Castle responded: "Maybe. I don't remember. I don't remember any."
¶ 116. Fresenius offers an example that "Millette testified about email exchanges involving herself, Dr. Hakim, and a [clinical quality manager] in which Dr. Hakim made observations, provided information, and asked questions about Attorney Notifications that he had reviewed and also sought legal advice." The State points out pertinent follow up questioning to Millette regarding an in camera document:
Q: And in the course of that conversation, did you provide any legal advice?
A: Yes, I did.
Judge Norton: But as to the document itself, the original e-mail is from [Dr.] Hakim to McIntyre, copy to you. And then the next e-mail is a response to that copy to you, but you don't have any comments in here. And there's nothing in here that I can see where they say, Ms. Millette, give me your opinion on this. Am I missing something?
A. No you're not. That's correct.
Judge Norton: Okay. All right.
¶ 117. The State is not seeking any communications between the chief medical officers and in-house counsel. The documents at issue in the present case consist of memoranda sent by company nurses (clinical quality managers) to company doctors for medical and safety purposes; the documents were not sent for legal purposes. As the State points out, other than hypothetical possibilities, Fresenius did not present evidence that the doctors sought legal services from in-house counsel or evidence that the doctors acted on behalf of Fresenius on any legal advice rendered.
4. Conclusion
¶ 118. Fresenius essentially takes issue with the chancery court's factual findings on the issue of attorney client privilege for attorney notifications. The so-called attorney notifications at issue here were sent to doctors or found in doctors' files. The State is not seeking any attorney notification sent solely to in-house counsel, nor does the chancery court's order require the production of such attorney notifications. We cannot say that the chancery court abused its discretion in finding that the particular attorney notifications at issue here were not privileged because they were prepared for patient safety purposes and not for the purpose of obtaining legal advice. Moreover, the evidence does not *68 show that the doctors received the notifications as a client or client representative under Rule 502. The chancery court's factual findings were supported by the evidence, including testimony of Fresenius's employees and former employees.
¶ 119. To borrow Fresenius's own language, the chancery court did not err by ordering Fresenius to produce notifications, that had been prepared by Fresenius employees at the direction of the chief medical officer for the purpose of reviewing medical and safety issues in response to adverse events simply because the same documents (not at issue here) were also sent to in-house counsel for the purpose of notifying counsel of potential litigation.
C. Whether the attorney notifications are protected by the work product privilege.
¶ 120. Fresenius argues that the attorney notifications are protected by the work product doctrine because they were prepared at the direction of in-house counsel with an eye toward future litigation. Fresenius claims it already produced other adverse event reports disclosing facts about every cardiac related adverse clinic event that occurred during the relevant time period.
¶ 121. "As a general rule, the material sought to be discovered, to come within the work product privilege, must have been prepared with an eye to litigation and not in the ordinary course of business." Haynes v. Anderson , 597 So.2d 615, 618 (Miss. 1992) (quotations and citations omitted). The Court has referenced another court's statement of the general rule:
The fact that litigation may still be a contingency at the time the document is prepared has not been held to render the privilege inapplicable, if the prospect of litigation is identifiable because of specific claims that have already arisen .... The test to be applied is whether, in light of the nature of the documents and the factual situation in this particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.
Haynes , 597 So.2d at 618 (quoting Hercules, Inc. v. Exxon Corp. , 434 F.Supp. 136, 151 (D. Del. 1977). "What is prepared with an eye toward litigation, and not in the ordinary course of business, is a matter which the trial court should consider in more detail using a case by case, item by item approach." Id. at 619.
¶ 122. "Even though privileged work product, the material may yet be discovered upon a showing of substantial need." Id. Mississippi Rule of Civil Procedure 26(b)(3) provides,
[A] party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including that party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of that party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.
M.R.C.P. 26(b)(3). Thus, "[e]ven if the party seeking discovery makes a showing of substantial need and undue hardship, pursuant *69 to the rule, 'the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney.' " Hewes v. Langston , 853 So.2d 1237, 1245-46 (¶ 32) (Miss. 2003) (quoting M.R.C.P. 26(b)(3) ).
1. Whether the chancery court erred by finding that the attorney notifications were sent to medical personnel in the ordinary course of medical business.
¶ 123. The chancery court found that because the attorney notifications were sent by the nurses to the doctors in the ordinary course of medical business, they did not constitute work product. The chancery court found that, according to Millette's testimony, the decision to send attorney notifications to the physicians was a medical business decision.
¶ 124. Millette testified that "[i]t was a medical business decision to send [attorney notifications] to these physicians, the Chief Medical Officer, or the physician in charge of the [Patient Safety Organization.]" Castle also agreed that it was a "medical business decision" to send the attorney notifications to the chief medical officer. Indeed, Castle testified that it was an administrative decision to include the chief medical officer on all attorney notifications when Dr. Lazarus requested the notifications. As a result, the notifications at issue served no legal purpose and were not prepared with an eye to litigation.
¶ 125. Castle testified that attorney notifications consisted of a subset of serious adverse events that clinical quality managers considered to be "potential litigation cases." Castle also testified that Fresenius did not anticipate litigation on GranuFlo until March 2012. Specifically, Castle said that the litigation in the present matter arose from the Dr. Hakim memorandum and was not anticipated until March 7, 2012. Castle explained,
This is all started for us on March 7, 2012 when we got a call from the FDA about the so called Hak[i]m memo, and from the first days of the exchanges with FDA about that, which I was involved in myself personally, we treated this whole issue about [GranuFlo] raised by the Hak[i]m memo as something likely to lead to litigation. From that point forward, we managed it essentially as litigation. And we viewed -- as viewed these days, we viewed the media exchanges as part of litigation defense, if you will.
¶ 126. Castle then retreated from his initial position and testified that Fresenius always anticipated the possibility of medical malpractice litigation that could in some way involve GranuFlo.
¶ 127. Baker testified that as part of her job responsibilities as a clinical quality manger, she prepared attorney notifications for the chief medical officers and the legal department. Baker testified that, upon receiving adverse event reports, she analyzed the report and used her clinical judgment to determine and identify potential root causes. Indeed, Baker unequivocally testified that she provided the potential root cause analysis and underlying facts of adverse events in the ordinary course of her duties at Fresenius. Millette likewise testified that the nurses performed a potential root cause analysis (and gathered a summary of facts and subsequent actions taken) on their own, regardless of what in-house counsel requested.
¶ 128. Based on the testimony, the chancery court did not abuse its discretion by finding that the attorney notifications at issue were not protected by work product privilege because they were prepared in the ordinary course of medical business.
*70 2. Whether the chancery court erred by finding that the attorney notifications were discoverable based on the State's substantial need and inability to obtain the substantial equivalent by other means.
¶ 129. Alternatively, the chancery court found that the attorney notifications were discoverable based on the State's substantial need and inability to obtain the substantial equivalent of the documents by other means. "Even though privileged work product, the material may yet be discovered upon a showing of substantial need." Haynes , 597 So.2d at 619. In support of the alternative finding, the chancery court referenced Castle's inability to identify documents providing potential root cause analyses via alternate means.
¶ 130. On appeal, Fresenius represents that the State "already has all of the adverse event reports (and all of the factual data contained in those reports) that were responsive to the State's requests." Fresenius limits its representation to "adverse event reports" and "factual data contained in those reports." However, Castle could not identify any reports that corresponded with incidents described in the attorney notifications. Similarly, Millette testified,
Q. Okay. Can you tell the Court one way or the other whether any of these situations where this report was made over to legal that the Chief Medical Officer received a separate notification, can you tell us one incident of that?
A. I would expect the vast majority of serious adverse events to be reported in parallel fashion that way. It would be unusual if it wasn't.
Q. And you said parallel fashion that way. Do you mean in a separate written notification to the Chief Medical Officer?
A. Some kind of report. I don't know exactly how it would be reported. There are many ways that these events were reported up.
Q. So the truth is, you can't tell us one way or another about any particular notification whether the Chief Medical Officer did or didn't get a separate notification than legal?
A. I can't tell you what the Chief Medical Officer received.
¶ 131. The State's case hinges on what Fresenius knew about the dangers of GranuFlo and when. Namely, the State argues that the attorney notifications will reveal that the nurses were, as described by Dr. Lazarus, growing increasingly alarmed about the dangers of high buffer and bicarbonate, which is highly relevant to proving Fresenius's knowledge of the falsity of its representations regarding GranuFlo. The chancery court did not abuse its discretion by finding that the State had a substantial need to obtain the documents and was unable to obtain the substantial equivalent of the documents by other means.
3. Conclusion
¶ 132. After review of the attorney notifications on appeal, we hold that the chancery court properly applied the law and its factual findings did not constitute an abuse of discretion. The chancery court's finding that the notifications were prepared by nurses and sent to medical personnel in the ordinary course of medical business is supported by the record. We affirm the chancery court's judgment.
III. Whether the chancery court erred in ordering Fresenius to produce public relations documents.
¶ 133. Fresenius argues that the public relations documents are protected by the attorney client privilege because they are communications between Fresenius employees *71 and Fresenius's in-house counsel about appropriate public statements for the company to make about GranuFlo. Fresenius also argues that the public relations documents also are protected by the work product doctrine because they were prepared in anticipation of litigation involving GranuFlo. Fresenius also argues that the chancery court did not address the work product doctrine as to the public relations documents in its order.
¶ 134. Fresenius describes the public relations documents as "emails between Fresenius employees and in-house counsel concerning proposed company statements to third parties to allegations about GranuFlo." Fresenius's description of the documents is accurate. The documents some of which were never used, generally consist of three types: drafts of press releases, customer talking points, and communications to the non-media, third parties outside Fresenius.
A. The Chancery Court's Order
¶ 135. The chancery court found that Fresenius failed to meet its burden of proving that the public relations documents were privileged under Rule 502. The chancery court noted that "the services provided by the attorney must be legal services in order to be cloaked with the privilege." M.R.E. 502 advisory committee note. Indeed, the chancery court recognized that Rule 502 protects confidential communications "made to facilitate professional legal services." M.R.E. 502. The chancery court, citing In re Bisphenol-A (BPA) Polycarbonate Plastic Prod. Liab. Litig. , No. 08-1967-MD-W-ODS, 2011 WL 1136440, at **3-7, 9-11 (W.D. Mo. Mar. 25, 2011), found that other courts previously have rejected the assertion of attorney client privilege as to an email exchange that included legal counsel and discussed the presentation of information to the press. The chancery court also cited Chesapeake Bay Foundation, Inc. v. United States Army Corps of Engineers , 722 F.Supp.2d 66, 73 (D.D.C. 2010), for the proposition that "merely stating that a communication contains legal advice or comes from an attorney, is insufficient to show that the privilege is appropriate."
¶ 136. The chancery court found that in-house involvement in the correspondence discussing public and customer service relations did not constitute legal work. Accordingly, the chancery court ordered Fresenius "to produce all documents enumerated [in its order] which concern public relations, media management, and customer talking points[.]"
¶ 137. After further review of the public relations documents, the Court is not adequately equipped to determine whether the chancery court abused its discretion as to each in camera public relations document. The Court has explained:
Only an in-camera inspection and subsequent document-by-document analysis, accompanied by the corresponding rule or exception, will meet the requirements for such determinations. It is impossible for this Court to rule on the decision of the circuit court as to the privilege of these documents because we are presented with a result but no specific reasoning. To hold otherwise would force this Court to become a finder of fact and "make a habit of conducting de novo review of items challenged during discovery."
Mississippi United Methodist Conference v. Brown , 911 So.2d 478, 482 (¶ 7) (Miss. 2005). Because the chancery court ordered the public relations documents to be produced as a whole without sufficiently analyzing each item and each claim of privilege, we reverse the chancery court's order on the present issue and remand for further *72 consideration and findings. See Powell , 105 So.3d at 315 (¶¶ 20-22).
B. The Chancery Court's Duty
¶ 138. The parties present the attorney notifications and public relations documents in an all or nothing manner, i.e. , privileged or not privileged. In turn, the chancery court ruled on the documents in an all-or-nothing manner. While the chancery court's decision to take up all of the attorney notifications at once was sufficient for the Court's review, we cannot say the same for the public relations documents, which are fundamentally different by nature.
¶ 139. The attorney notifications are of one type, i.e. , a subset of detailed adverse incident reports submitted to both in-house counsel and the chief medical office. While attorney notifications share the same fixed format, the public relations documents are a variety of email communications and attachments about a number of topics and do not consist of a fixed format. Although Fresenius has not challenged the chancery court's failure to make findings about each public relations document submitted in camera , we are constrained to reverse and remand for the chancery court to issue sufficient findings in compliance with Powell .
¶ 140. In Powell , we explained the trial court's duty:
Defendants have an obligation to identify specifically every relevant document withheld on the basis of privilege so the circuit court is able to make an informed decision on a motion to compel. The circuit court has an obligation to conduct an in camera review of every requested document withheld on the basis of privilege and to make detailed findings as to whether any documents requested are discoverable. This should be done on the record, stating the basis for each decision. We have held clearly that "blanket" orders compelling production of documents are not sufficient.
...
In this case, the order compelling production does not contain findings as to each document requested and does not sufficiently state the basis for the circuit court's order to compel. However, the trial court-not this Court-is in the best position to analyze parties' civil discovery disputes. Indeed, we have held that "[p]re-trial discovery is governed by flexible rules well within the administrative capacity of our trial courts." Therefore, we decline to engage in an analysis of whether Defendants should or should not be compelled to produce each item requested, as that analysis is best left for the circuit court. For these reasons, we find the circuit court erred in ordering the items requested to be produced without sufficiently analyzing each item and each claim of privilege, and we remand this case to the circuit court with instructions to conduct a careful and detailed in camera review of all documents over which privilege is asserted. The circuit court should make specific findings on the record "carefully considering whether to allow discovery, and stating the rule or exception which provides the basis for the decision."
Powell , 105 So.3d at 315 (¶¶ 20-21) (internal citations omitted) (emphasis added); see also Hewes , 853 So.2d at 1250 ("when objections to discovery of specific documents are made, the trial court should deal with each item on a case-by-case basis, carefully considering whether to allow discovery, and stating the rule or exception which provides the basis for the decision") ).
¶ 141. Here, the chancery court-not the Supreme Court of Mississippi on interlocutory appeal-is in the best position to analyze *73 the parties' civil discovery dispute. We decline to engage in an analysis of whether Fresenius should or should not be compelled to produce each item requested, as that analysis is best left for the chancery court. Because the chancery court did not sufficiently analyze each public relations document requested and did not sufficiently state the basis for its order to compel production, we reverse and remand the case to the chancery court.
¶ 142. Notably, the chancery court relied on In re Bisphenol-A (BPA) Polycarbonate Plastic Products Liability Litigation , 2011 WL 1136440, at *3, in which the district court's privilege rulings were set forth on a document-by-document basis On remand, the chancery court likewise should set forth its rulings on a document-by-document basis. We note that the term document refers to a family of documents, which might include several email communications and attachments in an email chain. Therefore, it might be necessary for the chancery court to deem certain individual communications and attachments privileged, while other communications and attachments in the same chain might not be privileged.
IV. Whether the chancery court properly followed Rule 53 of the Mississippi Rules of Civil Procedure.
¶ 143. Fresenius argues that the chancery court violated Rule 53 in several ways. Fresenius argues that the chancery court held
an ex parte conference with the special master to discuss a draft of the master's recommendation and then acted on the draft recommendation sua sponte , before the master had even filed the recommendation or the hearing transcript or the documentary evidence, and without giving the parties any opportunity to review and object to the recommendation." Fresenius accuses the chancery court of "prejudging" Fresenius's objections and "rubber stamping" the draft recommendation, and then attempted to cure the Rule 53 violations by holding another hearing and reaching the same result. Fresenius argues the "unfair process led to an unlawful outcome[.]
A. Standard of Review
¶ 144. Fresenius urges the Court to review the chancery court's application of Rule 53de novo . See Veal v. J.P. Morgan Tr. Co. , 955 So.2d 843, 845 (¶ 7) (Miss. 2007). "When the issues presented on an interlocutory appeal are questions of law, this Court will review those issues, as other questions of law, de novo ." Id. However, in Trovato v. Trovato , 649 So.2d 815, 820 (Miss. 1995), the Court applied an abuse of discretion standard of review when determining whether the chancery court had violated Rule 53. Trovato , 649 So.2d at 820 ("The chancellor's refusal to hear any argument [opposing the special master's report] whatsoever from the parties was an abuse of discretion."). Again, "[t]he standard of review used in considering a trial judge's ruling regarding discovery is abuse of discretion." Powell , 105 So.3d at 312 (¶ 10). Because in Trovato , the Court employed an abuse of discretion standard of review in a Rule 53 dispute and because a trial judge's ruling regarding discovery is reviewed for an abuse of discretion, we likewise employ an abuse of discretion standard of review.
B. Whether the assignment of error is moot.
¶ 145. "[R]eview by appellate courts of immaterial, unnecessary, or moot questions will not ordinarily be considered." Insured Sav. and Loan Assoc. v. State, ex rel. Patterson , 242 Miss. 547, 135 So.2d 703, 707 (1961) ; see also *74 In re Order Establishing Civil, Criminal Divisions in Hinds Cty. Circuit Ct. , 166 So.3d 481, 484 (¶ 11) (Miss. 2012) ("Judge Green has withdrawn the order challenged by Judge Weill's petition. Therefore, there is no actual controversy. The issues raised in Judge Weill's petition are moot."). Any violation of Rule 53 was rendered moot by the chancery court's setting aside its order accepting the special master's recommendation and holding an entirely new hearing to consider the same issues that had been presented to the special master.
¶ 146. We have long held that we will not adjudicate moot questions. Allred v. Webb , 641 So.2d 1218, 1220 (Miss. 1994) ; see also Nat. Mother v. Paternal Aunt , 583 So.2d 614, 617-18 (Miss. 1991) (holding that the chancellor's grant of a petition for adoption rendered the issue of custody moot because by addressing and granting the petition for adoption, the chancellor necessarily adjudicated custody "anew"); Rhodes v. Rhodes , 336 So.2d 1315, 1316 (Miss. 1976) ("Having paid the amount which he had been ordered to pay, and it being a civil contempt adjudication, ... the error, if any, in the chancellor's holding has become moot and decision by this Court would be an exercise in academics."); In re Conservatorship of Estate of Loyd , 868 So.2d 363, 371 (¶ 23) (Miss. Ct. App. 2003) (holding "[t]he action for slander of title was therefore rendered moot when the chancellor entered his judgment setting aside the conveyance which was the subject of the slander of title suit."); C.M. v. R.D.H., Sr. , 947 So.2d 1023, 1028 (¶ 14) (Miss. Ct. App. 2007) (holding that "[t]he Hinds County chancellor recognized Scott County's continuing jurisdiction and vacated all previous orders which would have modified the original child custody order. Thus, C.M.'s argument is moot.").
¶ 147. " Rule 53 contemplates the idea that if a party objects to the special master's report, the chancellor must in fact hear the objections and not merely sign off on the submitted report." Trovato , 649 So.2d at 820. In Trovato , we held that the chancellor's refusal to hear any argument whatsoever from the parties was an abuse of discretion. Id. Here, the chancery court accepted the special master's recommendation before the parties were able to review it and without hearing argument from the parties. But unlike the chancery court in Trovato , the chancery court did not refuse to hear any argument whatsoever from Fresenius. The chancery court explained:
Clearly the procedure that we've always used in this -- in this court is when a master hears a matter, the -- if there is either party that is aggrieved with that decision, they certainly have the right to ask that the Chancellor hear it. As opposed to going through any objections that you may have, Mr. Campbell, today, what I'm going to do is I'm going to hear that original motion that the Master heard myself.
¶ 148. Indeed, the chancery court apprised itself of Trovato , recognizing that Fresenius should have been entitled to object to the special master's recommendation and have a hearing to consider the same. Accordingly, the chancery court advised the parties that the order accepting the special master's recommendation would be set aside. The chancery court also advised the parties that it would conduct a de novo evidentiary hearing at which the parties would be permitted to offer the entire transcript of the special master proceeding as well as additional argument and exhibits if they desired. Although the transcript had not been filed, the chancery court informed the parties that it had read the entire transcript. We hold that any violation of Rule 53 was rendered moot when the chancery court set aside its prior order accepting the special *75 master's recommendation and holding a hearing anew to consider the same issues that had been presented to the special master.
¶ 149. Fresenius argues that the de novo hearing did not "cure the prejudice to Fresenius" as a result of the alleged noncompliance with Rule 53, because the chancery court had "prejudged the substantive privilege issues without considering the evidence or Fresenius's arguments." Fresenius cites no legal authority in support of its argument, and no prejudice is evident in the record.
¶ 150. The chancery court specifically addressed Fresenius's claim of prejudice by giving Fresenius "an entirely new hearing." The chancery court assured the parties multiple times that it was considering the matter anew. We take the chancery court at its word. The chancery court did not simply re-enter its prior order accepting the special master's recommendation. Moreover, the chancery court disagreed with the special master's recommendation to assess fees and costs to Fresenius. The mere fact that the chancery court reached the same result as to the production of documents, i.e. , ordering all withheld attorney notifications and public relations documents to be produced, does not "prove" that the chancery court had "prejudged the privilege issues," as Fresenius suggests. Likewise, the record does not show any impropriety with respect to any discussions between the special master and the chancery court.
¶ 151. Fresenius also claims that the chancery court failed to "correct glaring errors" in the special master's recommendation. Again, any contention as to the specific findings of fact and conclusions of law in the special master's recommendation became moot when the chancery court set aside its order accepting the special master's recommendation in toto . The chancery court heard the entire matter de novo and assured the parties of the same. Counsel for Fresenius acknowledged as much at least three times. Fresenius's assignment of error is moot. Moreover, Fresenius's claim of prejudice and accusation of the chancery court's prejudging the claims of privilege are not supported by the record.
CONCLUSION
¶ 152. The Court reverses the chancery court's order with respect to the public relations documents and remands for further proceedings consistent with the opinion. The Court affirms the chancery court's judgments in all other respects.
¶ 153. NO. 2016-IA-01385-SCT: AFFIRMED AND REMANDED.
NO. 2017-IA-00443-SCT: AFFIRMED IN PART; REVERSED IN PART AND REMANDED .
WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.

The State takes issue with the term attorney notification because the characterization presents the documents as privileged materials. The State identifies the same documents as "nurses's memoranda to doctors" or "root cause analysis documents." For the sake of clarity, the Court generally will refer to the documents as attorney notifications because the term is used routinely in the record and ultimately by the chancery court in its March 15, 2017, order.

The State takes issue with the term Public Comment Advice, claiming that Fresenius coined the term for the first time on appeal. For the sake of clarity, the Court will refer to the documents as public relations documents because the parties and chancery court frequently referred to the documents as such at the trial level.

The State filed a motion strike the first of two issues identified in Fresenius's Statement of Issues on Appeal in case number 2016-1385 because the first issue was not included in Fresenius's petition for interlocutory appeal, which had set out one issue. After the petition was granted, Fresenius filed a Statement of Issues, which added the following issue: "Whether the Chancery Court erred in concluding that Freseinus'[s] treatment of email chains and email attachments in its privilege log was insufficient to identify the communications that Fresenius withheld based on attorney-client privilege and the work-product doctrine." Fresenius responded that the State simply ignored the "substance of the issues, and thus fails to acknowledge that they are the same issues whether listed as one or two." The Court entered an order passing the motion for consideration along with the merits of the appeal. Fresenius's appellant's brief now identifies the sole issue on appeal as Issue I. Because Fresenius has removed the disputed issue, and because the issue set out by Issue I essentially mirrors the issue set out in Fresenius's petition, we deny the State's motion to strike as moot. The Court notes that the only difference between the issue set out in the petition and the issue set out in the appellant's brief is that, in the petition, the phrase "ordering Fresenius to produce thousands of privileged documents" had been used in place of the phrase "finding a blanket waiver and ordering Fresenius to produce privileged documents."

Fresenius verified that twenty-seven of the 101 attorney notifications submitted were documents sent to doctors or found in doctors' files which concerning or discussing an unknown acid concentrate, which possibly could have been GranuFlo.

The chancery court found that the assignment was reasonable and necessary for the orderly, smooth, and efficient dispensing of justice in the case sub judice , in all other matters pending, and in view of the chancery court's trial docket.

The Patient Safety Organization documents are not at issue on appeal.

The State disputes Fresenius's statement, claiming that "Fresenius has not produced or identified any adverse-event report to the State that addresses the same incidents discussed in the nurses' memoranda [attorney notifications] at issue."